FILED

2015 Jan-12  AM 11:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| ISRAEL HENRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 7:12-cv-00128-JHE |
| | ) | |
| ALLIED INTERSTATE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Israel Henry ("Henry") initiated this action in the Circuit Court of Tuscaloosa County, Alabama, against Defendant Allied Interstate, Inc. ("Allied") alleging claims under the Fair Debt Collection Practice Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. (Count I) and state law claims for invasion of privacy (Count II); negligent, wanton, and/or intentional hiring, training, and supervision of debt collectors (Count III); and negligent, wanton, and intentional conduct (Count IV).  (Doc. 1-1).  Allied subsequently removed the action to this Court, (Doc. 1).  Allied now moves for partial summary judgment, seeking a judgment on all of Henry's state law claims and on two of Henry's FDCPA claims.  (Doc. 27).   The motion is fully briefed and ripe for review.  (Docs. 28, 33, & 37).   For the reasons stated below, the undersigned recommends Allied's motion, (doc. 27), be **GRANTED**.  Because the motion for summary judgment does not address all of Henry's claims, several FDCPA claims remain pending.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, the discovery, and disclosure materials on file, and any affidavits "show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a Court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. V. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will

not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Factual Background

In connection with his studies at ITT Technical Institute, Henry took out two student loans, one in approximately 2002 through Sallie Mae and a Direct Loan in 2006 through the Department of Education ("DOE"). (Doc. 29-1 at 16-17 (59:8-62:21)).[1]  Although Henry paid off the 2002 Sallie Mae loan, he only made approximately twelve payments of $400 on the 2006 Direct Loan. (*Id.*). When Henry stopped making payments (approximately May 2010 because his wife lost her job), he did not contact the DOE regarding his asserted inability to make payments or to make arrangements for reduced payments. (*Id.* at 17 (63:1-3; 64:5-9)).

On or about July 24, 2011, the DOE retained Allied to attempt to collect the balance Henry owed on the delinquent loan. (Doc. 29-2 at 12 (11:11-19)). Allied is a debt collection agency, and the DOE contracts with Allied to collect defaulted student loans. (Doc. 29-3 at 12 (41:4-6; 43:13-17)). Henry asserts his first contact with anyone regarding the delinquency of his loan came from Allied. (29-1 at 17 (64:10-18)). On Friday, August 26, 2011, Henry received an email from one of his co-workers, George Odom, stating "[j]ust got a call wanting you and it was an 'Unidentified' 877 number so I screened it. When I inquired he said kind of rudely that it was 'personal business.' His name and # is Mike Southerington @877-220-****." (*Id.*at 18 (66:2-67:20)). Henry agrees Southerington, an Allied collector, handled the call appropriately. (*Id.* at 19 (69:8-14)). Henry "googled" Southerington's phone number and discovered it belonged to Allied. (*Id.*at 19 (70:10-15)). Around this time, Henry discussed with this wife the possibility of

---

[1] All citations to the record are to document and page numbers as assigned by the Court's electronic filing system (CM-ECF), except for citations to depositions, which refer to both the CM-ECF page number and the deposition page (and often line numbers). Internal page numbers have been disregarded with the exception of page numbers for deposition transcripts.

paying $100 per month on the loan.  (*Id.* at 19-20 (72:19-73:19)).

On Monday, August 29, 2011, Henry called Southerington from his workplace.  (Doc. 29-1 at 20 (75:19-76:4)).  Henry and Southerington discussed the defaulted loan and payment arrangements.  (*Id.*at 21 (77:1-15)).  At this point, Southerington asked for Henry's monthly income and monthly bills and told Henry he needed to make a down payment of "three hundred and something [dollars]" and then make monthly payments of two hundred dollars for ten consecutive months.  (*Id.* at 21 (77:7-78:6)).   Henry told Southerington he could not afford to make those payments, and he could only make $100 payments.   (*Id.* at 21 (78:8-17)).  Southerington informed Henry that paying only $100 a month was not an option and that the previous option was "what [Allied] could take."  (*Id.*at 21 (78:18-79:2)).

Henry initially testified Southerington then told him "[A]llied would start – or that they would garnish [his] wages."  (Doc. 29-1 at 21 (79:3-10)).  Henry continued by testifying "[w]hen I told [Southerington] what I could pay, he said that they would garnish my wages, and then I told him that I couldn't pay that, there was no way, and that's when he said, well, the garnishment process is already started."  (*Id.*at 22 (81:1-6)).  It is unclear from Henry's testimony whether he is alleging Southerington said Allied would garnish his wages, Allied had already began garnishing his wages, or both.  (*See id.*at 22 (80-82)).  Henry testified this alleged threat of garnishment got a lot of things "going through [his] head" including losing vehicles.  (*Id.* at 26 (99:8-16).  There is no evidence Allied ever garnished Henry's wages.

During this call, Henry asked Southerington whether he had added up his monthly bills, and Southerington replied that he had not.  (Doc. 29-1 at 22, 23 (82:20-22; 87:1-21)).  Henry told Southerington if he would add up the monthly expenses, he would see a negative cash flow of about $70 per month.  (*Id.*at 23 (87:1-21)).  Opposing counsel questioned Henry about this,

because, based on the numbers, it appeared Henry had approximately $1,000 left over each month. (*Id.*at 23 (87:22-88:4). Henry testified he must have given additional bill amounts to Southerington, but could not specifically identify any at his deposition. (*Id.*). Later in the deposition, Henry testified he could not remember whether he had given a total amount to Southerington or if he had provided him the amount of each individual bill. (Doc. 29-1 at 22-23 (82-91)). At his deposition, Southerington confirmed the contents of his accounts notes from the August 29, 2011 call (specifically the call at 9:42). (Doc. 29-4 at 44 (171:5-17)). The notes state he "[e]xplained rehab and told him possibility of AWG [administrative wage garnishment], taxes, et cetera. Updated financial information.[2] Told me he only had $160 a month left over. Told me not possible to garnish. Told him his is a federal loan and need to go to court since it's a federal loan. Told him $360 a month first month then $190 a month." (*Id.*). When asked about Allied's account notes for the August 29, 2011 call, Henry could not recall whether Southerington explained the rehabilitation process, mentioned the possibility of garnishment or the possibility his income tax refund could be seized, or stated that because it was a federal loan, there was no need to go to court to get a garnishment order. (Doc. 29-1 at 30 (113:3-114:19)). Nor could Henry recall whether he told Southerington he only had $160 per month after bills were paid or that it was not possible to for Allied to garnish his wages on this call. (*Id.*).

Southerington then handed the call to assistant vice-president of operations Jonathan Hannahs, whom Henry described as a "wage garnishment specialist." (Doc. 29-1 at 27 (104:10-15). Hannahs testified Henry refused a rehabilitation of his Direct Loan and stated Allied could

---

[2] Henry's contention Southerington did not record or write down his financial information is not supported by the record. The cited testimony only refers to Southerington not adding up the numbers or computing the figures. (Doc. 29-1 at 22-23 (82-91)). It is also unclear from Henry's testimony whether he gave Southerington the amount of each of his monthly bills or if he just gave him a monthly total. (*Id.*).

not pursue garnishment due to the loan being a "Sallie Mae . . . loan." (Doc. 29-2 at 45 (44:2-12)). Hannahs tried to explain that was incorrect and that he did not want Henry making a decision based on inaccurate information. (*Id.*). Hannahs also told Henry the only requirement to start wage garnishment on this type of loan would be to send a letter to the employer. (*Id.* at 27 (104:17-23)). Henry asked whether any check he sent should be made payable to the DOE and stated he would send in what he could, i.e., something less than the amount that would qualify him for a rehabilitation program. (*Id.*at 45-46 (44:14-45:15)). According to Hannahs, Henry again said Allied could not garnish his wages due to him "making payments." (Doc. 29-2 at 46-47 (45:19-46:16)). Hannah testified he advised Henry that payment arrangements need to be "acceptable," such as qualifying for a rehabilitation program, and that Hannahs would mark the account as "unable to pay." (*Id.*at 48 (47:4-22)). The testimony Henry cites in response to Hannahs' testimony does not contradict or dispute it. (*See* doc. 33 at 12-13 (citing doc. 29-1 at 27, 28 (104:14-23, 107:10-16)). Regarding this conversation, Henry testified he may have told Hannahs he could not do a rehabilitation and that Allied could not pursue garnishment due to the type of loan at issue. (Doc. 29 at 28 (105:12-106:17)). Henry testified he could not recall whether Hannahs stated Henry had incorrect information, whether he (Henry) asked if any check he wrote should be made payable to the DOE, whether he told Hannahs he would send what he could, whether he told Hannahs that Allied could not garnish his wages due to him making payments, and whether Hannahs told him any payment arrangement would need to be acceptable. (Doc. 29-1 at 28 (106:2-23)).

Henry called Allied a second time on August 29, 2011. (Doc. 29-1 at 29 (112:10-18)). Henry testified he did not recall, as the account notes indicate, whether he hung upon Southerington after Southerington tried to assist him. (*Id.* at 29-30 (112:19-113:5)). Henry

further testified he was on his cell phone at the time and could have lost cellular service (as opposed to intentionally terminating the call).  (*Id.*).

Henry further testified during a final call with Allied on August 29, 2011, he spoke with another representative.[3]  (Doc. 29-1 at 30 (115:9-14)).  Henry told the representative he'd like to make payments, and (according to Henry) the representative told him they could work out some sort of payment arrangement.  (*Id.*at 31 (117:1-4)).  Henry asked the representative to send a letter confirming this.  (*Id* (117:4-6)).  Henry said he needed to talk with his wife, but would be waiting on the letter and would call back.   (*Id.* (117:6-11)).  Henry did not call Allied back the next morning or at any time, explaining he "could have got busy at work."  (*Id.* (117: 21-118:6)). Henry further testified he did not call Allied back because he was waiting on a letter confirming Allied would work out a payment arrangement and not garnish his wages.  (Doc. 29-1 at 31) (119:11-17)).  Henry also testified this representative told him there was no bill information in his file.  (*Id.* at 30 (116:4-9)).  However, this representative testified the account note indication "updated financial statement [F/S]" indicates there was already financial information contained in the file.  (Doc. 29-5 at 30 (109:1-110:8)).

While the DOE allows Allied to send letters to consumers, the only letters that can be sent are form letters the DOE has preapproved, which do not include the kind of letter Henry requested.  (Doc. 29-5 at 36-37 (136:22-137:9)).  If Henry would have requested a non-form letter, the representative testified he would have advised Henry he could not send such a letter. (*Id.* at 37 (137:10-138:10)).  Henry never received any correspondence from Allied.  (Doc. 29-1 at 28 (102:2-4)).

---

[3] While Henry testified he spoke with a "Mr. Hart," (doc. 29-1 at 30 (115)), Allied states Henry spoke with a representative named Jeff Howard, who is Allied's administrative supervisor on the DOE contract, (doc. 28 at 12).

Although Henry could not recall the exact number of conversations he had with an Allied employee, he agreed it could be between three and five.  (Doc. 29-1 at 31 (120:13-23)).

After speaking with these Allied representatives, Henry lost one or two hours of sleep a night for three or four nights before resuming a normal sleep schedule.  (Doc. 29-1 at 39 (145:3-22)).  Henry did not see a healthcare provider for the alleged sleep interruption and took no medication for it.  (*Id.* (145:23-146:4)).  He also contends some of Allied's employees were rude to him, cutting him off mid-sentence and talking over him.  (*Id.*at 32 (121:1-122:4)).  Henry testified this made him feel "worthless" because he owed money and wouldn't pay it when he contends he was trying to make a reasonable payment.  (*Id.* (122:5-16)).  He also testified the alleged threats of garnishment caused him nervousness and stress because he believed he would not be able to afford rent if his wages were garnished or because he believed Allied would collect the payments by any means necessary.  (*Id.* (39, 41, 42) (151, 157, 163)).  Although Henry testified he was embarrassed when Allied called his work and "put his debt in the open," (*id.* at 45 (174:22-175:5)), he agreed Southerington only stated the reason for his call was "personal business" and that Southerington handled the call appropriately, (*id.* at 19 (69:8-14)).

Since defaulting on the loan and since Allied's collection efforts, Henry has made no payments on the loan.  (Doc. 29-1 at 33 (127:7-11)).

Prior to this action, Allied has disciplined Southerington on two unrelated occasions since the beginning of his employment in June 2011.  (Doc. 29-4 at 7 (21:13-18)).  The first occasion was when Southerington failed to document that an individual had requested Allied not telephone him.  (*Id.* at 8 (25:13-26:18)).  In response, Allied warned him about the documentation omission, sent him home for a day, and docked a day's worth of wages.  (*Id.*).  Allied disciplined Southerington on a second occasion when he failed to meet his monthly

collection goals over a three-month period.  (*Id.* at 9 (30:14-17)).

## III. Analysis

### A.  Fair Debt Collection Practices Act Claims

Allied seeks summary judgment on two of Henry's FDCPA claims, specifically arguing it did not violate § 1692c(a)(1) (calling at an inconvenient time, i.e., before 8 a.m. or after 9 p.m.) or § 1692(b)(1) (third-party disclosure) of the FDCPA.  (Doc. 27 at 17-18).  Henry concedes that both of these claims are due to be dismissed, although not necessarily for the same reasons as Allied asserts.  (Doc. 33 at 7, 19).  Accordingly, the undersigned recommends these claims be **DISMISSED**.  Henry's other FDCPA claims remain pending.  (*See* doc. 1-1 listing the following claims:  §§  1692c(a)(3),  1692d,  1692d(5),  1692e,  1692e(1),  1692e(2),  1692e(4),  1692e(5), 1692e(7), 1692e(10), 1692e(11), 1692f, 1692f(1), 1692f(6), and 1692g).

### B.  State Law Claims

#### 1.  Invasion of Privacy[4]

Alabama courts recognize the tort of invasion of privacy in the context of a debt collector's attempts to collect a debt, particularly recognizing that certain unreasonable collection efforts can be an "intrusion upon the plaintiff's physical solitude or seclusion."[5]  *See Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705, 708 (Ala. 1983); Restatement (Second) of Torts, §

---

[4] As there is no federal cause of action for "invasion of privacy" and Henry has abandoned any such claim, the undersigned addresses invasion of privacy as only a state law claim.

[5] It is generally accepted that the invasion of privacy tort consists of four distinct wrongs: (1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use. *Norris v. Moskin Stores, Inc*., 132 So.2d 321 (Ala.1961) (citing W. Prosser, Law of Torts, at 637-39 (2d ed. 1955)).

652B (1977).  Specifically, the Alabama Supreme Court has characterized invasion of privacy in this context as "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person or ordinary sensibilities" and requires the creditor's actions to "exceed the bounds of reasonableness."  *Shuler v. Ingram & Associates*, 441 Fed. Appx. 712, 720 (11th Cir. 2011) (quoting *Jacksonville State Bank v. Barnwell*, 481 So. 2d 863, 865-66 (Ala. 1985)).  However, FDCPA violations do not necessarily constitute invasion of privacy under Alabama law.  *Leahey v. Franklin Collection Serv., Inc.*, 756 F. Supp. 2d 1322, 1327 (N.D. Ala. 2010).  "The mere effort . . . to collect a debt cannot without more be considered a wrongful and actionable instruction.  The Alabama Supreme Court has 'recognized the right of a creditor to take reasonable action to pursue a debtor and collect a debt.'"  *Shuler*, 441 Fed. App'x at 720 (quoting *Barnwell*, 481 So. 2d at 865).  Moreover, efforts to collect a debt may be annoying, embarrassing, and upsetting without rising to the level of an invasion of privacy.  *Leahey*, 756 F. Supp. 2d at 1327-28.

Henry first argues summary judgment on this claim is inappropriate because whether a particular intrusion is sufficiently outrageous or offensive to a reasonable person to create liability is a question of fact for the jury.  (Doc. 33 at 22 (citing *Cunningham v. Dabbs*, 703 So. 2d 979, 982 (Ala. Civ. App. 1997)). As this Court explained in *Hunt v. 21st Century Mortgage Corp.*:

> The Alabama courts have not addressed directly whether [the invasion of privacy] standard is to be applied as a question of law or of fact, but they appear to treat it as a mixed question following the same general pattern as negligence law.  The courts perform a gatekeeping role, determining whether the alleged privacy interest is a type protected by the law.  *See, e.g., Johnston v. Fuller*, 706 So.2d 700, 702–03 (Ala.1997) (determining at summary judgment stage that a claim based on "voluntary interviews in which the defendants learned information already known to others ... is not protected by the limited scope of the wrongful-intrusion branch of the invasion-of-privacy tort"). . . . The jury, however, makes the final determination of whether a particular intrusion is sufficiently outrageous

or offensive to a reasonable person to create liability.  *See Cunningham v. Dabbs*, 703 So.2d 979, 982 (Ala.Civ.App.1997) ("[W]e hold that whether this conduct was severe enough to constitute an invasion of Cunningham's right to privacy is a question of fact to be determined by a jury."); *K–Mart Corp. v. Weston*, 530 So.2d 736, 739 (Ala.1988) ("It was within the jury's province to conclude that the plaintiff's desire for anonymity had been interfered with and that the defendant had intruded beyond the limits of decency."); *Jacksonville State Bank v. Barnwell,* 481 So.2d 863, 866 (Ala.1985) ("[T]he record raises issues of fact regarding whether the actions of [the defendant] constituted a campaign of harassment and were beyond the bounds of reasonableness, giving rise to liability for invasion of privacy.").

No. 2:12-cv-02697-WMA, 2014 WL 426275, *7 (N.D. Ala. Feb. 4, 2014).  Thus, the Court must first determine whether the alleged privacy interest is a type protected by the law and then whether the plaintiff has presented sufficient evidence to present the second question, whether a particular intrusion is sufficiently outrageous or offensive to a reasonable person to create liability, to the jury.

As noted above, Alabama courts recognize the tort of invasion of privacy in the context of a debt collector's attempts to collect a debt, particularly recognizing that certain unreasonable collection efforts can be an "intrusion upon the plaintiff's physical solitude or seclusion."  *See Phillips*, 435 So. 2d at 708.  As to the second question, although he relies heavily on *Hunt*, Henry does not allege the number of debt collection phone calls made the collection efforts outrageous or offensive to a reasonable person, and for this and other reasons, *Hunt* is clearly distinguishable.  *Hunt* turned on three key pieces of evidence – none of which are present in this case. 2014 WL 426275 at *8.  Specifically, the plaintiff presented evidence the defendant's calls were outrageous because the plaintiff was not the debtor, the plaintiff alleged the defendant called more than 100 times, and the plaintiff alleged the defendant not only called him, but also called his neighbors and relatives.  *Id.*  There is no such evidence in this case.  Instead, Henry argues Allied representatives made "illegal threats," pretending to work with him when asking

11

about his finances and threatening immediate garnishment, which he claims is a misrepresentation of the law. (Doc. 33 at 23-24). Henry contends these actions were not "legitimate efforts to collect the debt" and therefore unreasonably invaded his privacy. (*Id.* at 25).

Henry's testimony regarding these alleged "illegal threats" do not support the arguments in his brief. First, Henry contends the collection efforts were unreasonable because the representative pretended to work with him when asking about his finances because the representative later admitted he did not document all of Henry's financial information. (Doc. 33 at 23-24). Henry's deposition testimony does not support his argument. It is clear from Henry's deposition testimony that Southerington presented Henry with a specific loan rehabilitation plan requiring an immediate payment of $300 and monthly payments of $200. (Doc. 29-1 at 21 (77:7-78:6)).). The representative presented this rehabilitation plan at the same time he asked about Henry's finances and never waivered from the terms of the rehabilitation plan. (*See id.*). There is simply no evidence to present to a jury to support the argument that Allied pretended to work with Henry.

There is also no evidence Allied representatives made illegal threats regarding garnishment. Henry's testimony is inconsistent regarding whether the Allied representative said the garnishment process had begun or whether they could initiate it. Furthermore, it is undisputed that the Higher Education Act of 1965, as amended, provides that a federal guaranty agency may administratively garnish a student loan debtor's disposable wages. 20 U.S.C. § 1095a. Although the Act provides for an opportunity for a hearing, it is an administrative process, and the representative was correct in advising Henry this was not the type of garnishment that required a court case. *See* 20 U.S.C. § 1095a(a)(5).

Henry has not offered any evidence that Allied's actions were sufficiently outrageous or offensive to a reasonable person to send this claim to a jury. Accordingly, summary judgment is due to be granted on this claim.

### 2.  Negligent, [6] Wanton, and Intentional Conduct

Henry's claim for wanton and intentional conduct fails because there is no evidence Allied consciously or intentionally committed a wrongful act causing injury to Henry. Wantonness is "the conscious doing of some act or omission of some duty under knowledge of existing conditions, while conscious that from the doing of such act or omission of such duty injury will likely or probably result." *Sellers v. Sexton*, 576 So. 2d 172, 175 (Ala. 1991); *see also* Ala. Code § 6-11-20.  Although wantonness, once proven, can support a wider range or damages than negligence, the "injury" prong of the wantonness test mirrors that of negligence. *Hunt*, 2014 WL 426275, at *9 (citing Alabama state cases).

Here, there is no evidence Allied had any reason to expect injury would likely or probably result from the less than five telephone conversations its representatives had with Henry, and there is no evidence of any physical or monetary injury. *See id.* Furthermore, as explained above, Henry's testimony does not support his assertions Allied *intentionally* misrepresented the law regarding garnishment and *lied* to Henry about whether they could force him to pay his debt through garnishment, whether he could stop it, or what amounts he had to pay. *See* doc. 33 at 27.

### 3.  Negligent, [7] Wanton, and/or Intentional Hiring, Training, and Supervision

A plaintiff alleging defects in hiring, training, and supervision must prove an underlying

---

[6] Henry has withdrawn his claim for negligence. (Doc. 33 at 26).

[7] Henry does not address his claim for negligent hiring, training and supervision, (doc. 33), and therefore it is deemed abandoned.

tort, i.e., the underlying wrongful conduct of the employee.  *Shuler*, 441 Fed. App'x at 720 (citing *Voyager Ins. Cos. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002)).  Because all of Henry's state law tort claims fail, his claim for wanton and/or intentional hiring, training, and supervision fail as a matter of law and is due to be dismissed.

## IV. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** Allied's motion for summary judgment, (doc.  27), be **GRANTED**.  Henry's FDCPA claims pursuant to §§ 1692c(a)(1) and § 1692(b)(1) and his state law claims are to be **DISMISSED WITH PREJUDICE**.  Henry's other FDCPA claims remain pending.

## V. Notice of Right to Object

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b)(2), Fed. R. Civ. P., any party may file specific written objections to this report and recommendation within fourteen (14) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fourteen (14) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

DONE this 12th day of January 2015.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE